**IN THE COURT OF APPEALS OF IOWA**

No. 21-0023
Filed April 14, 2021

**IN THE INTEREST OF J.L., B.L., P.L., and K.L.,**
**Minor Children,**

**J.L., Mother,**
     Appellant.

_____

Appeal from the Iowa District Court for Mahaska County, Rose Anne Mefford, District Associate Judge.

A mother appeals the termination of her parental rights to four children. **AFFIRMED.**

Michael S. Fisher of Fisher Law Office, Oskaloosa, for appellant mother.

Thomas J. Miller, Attorney General, and Meredith L. Lamberti, Assistant Attorney General, for appellee State.

Eric J. Palmer, Oskaloosa, attorney and guardian ad litem for minor children.

Considered by Vaitheswaran, P.J., and Tabor and Ahlers, JJ.

**TABOR, Judge.**

The mother, Jessica, appeals the termination of her parental rights to four children. She contends the State did not prove the statutory grounds for termination; the juvenile court should have given her additional time; and it was not in the children's best interests to end her parental relationship. Jessica naturally highlights her recent success in completing a first step in substance-abuse treatment. But unfortunately the record reveals a pattern of her seeking treatment without follow up. Concerned that she would repeat the pattern, the juvenile court decided she had not been substance-free long enough to resume custody. Jessica admits as much and asks for a delay in permanency. We cannot sanction that delay when her treatment history provides little reassurance that the need for removal will be resolved in short order. Finally, we agree with the juvenile court that terminating Jessica's parental rights serves the children's best interests. So we affirm.

## I. Facts and Prior Proceedings

In June 2018, the Iowa Department of Human Services (DHS) became involved with this family after a domestic-violence incident. The perpetrator was Jessica's husband and the children's father, Jacob.[1] An investigation revealed the parents' methamphetamine addictions. The juvenile court removed the children from Jessica and adjudicated them as children in need of assistance (CINA). Because Jessica is a member of the Osage Nation, the State notified the relevant tribe of the proceedings under the Iowa Indian Child Welfare Act

---

[1] Jacob was charged with domestic abuse assault. Later, he and Jessica were both convicted of violating a no-contact order.

(ICWA). *See* Iowa Code § 232.7; ch. 232B (2018). Osage Nation Social Services determined the children were members of the tribe and intervened as a party in the proceedings.[2]

The court placed the children with Jacob. It ordered both parents to obtain substance-abuse and mental-health treatment and consent to drug testing. In October 2018, the DHS removed the children from Jacob and placed them with their paternal grandparents. That move came because Jacob continued to use methamphetamine and allowed the children contact with Jessica, who also continued using drugs. After Jacob completed inpatient substance-abuse treatment the following spring, the DHS restored his custody.

For her part, Jessica obtained substance-abuse evaluations but did not engage in treatment. Then in the spring of 2019, Jessica entered inpatient treatment at Clearview Recovery Center. She discharged successfully in June. She moved back in with Jacob and the children, and the court transferred custody back to them in August. The family reunion was short-lived. By September, Jacob and Jessica were using methamphetamine again. Both parents and then-twenty-month-old J.L. tested positive for the drug. The DHS removed the children and placed them in the custody of their maternal grandparents in October.[3]

---

[2] In her appeal, Jessica does not raise any ground for reversal that involves the additional protections for Indian children in child-welfare proceedings. *See* Iowa Code ch. 232B. So we decline to address those requirements.

[3] We will refer to Jessica's father and his wife (the children's step-grandmother) as the grandparents.

Over the next year, the parents struggled with sobriety and becoming safe caregivers.  Jessica moved in and out of a home she shared with Jacob.  They remained married but expressed a desire to divorce.  Jessica spent most nights at the home of her paramour, Jamie.  The DHS was concerned about this relationship.  In December 2019, Jessica candidly told DHS she was using again and not attending treatment.  The next month, she reported she was moving to Oklahoma to live with her sister's family.  Jessica believed she had a better shot at staying sober if she left Iowa.  The DHS provided her with treatment resources in Oklahoma.  But only days later, Jacob drove to Oklahoma and brought Jessica back to Iowa.  She then went back to staying with Jamie.

At a March 2020 meeting, Jessica admitted she was still using methamphetamine.  She reported using once a day, a large decrease from her previous practice.  That month, she returned to Oklahoma, where her family had arranged for substance-abuse treatment.  Jessica and Jacob said they intended to go together and eventually bring the children to Oklahoma to live with them.  Also at the March meeting, the DHS worker encouraged Jessica to get in touch with Osage Nation Social Services for help setting up services in Oklahoma.

Jessica soon left Oklahoma.  She had little contact with DHS until that June, when she called her social worker to report entering inpatient treatment at Clearview again.  But Jessica left Clearview three days later.  She explained it was because she ran out of her pain medications.  She returned to treatment in July and successfully completed the program in September.  While there, she also started therapy.

Meanwhile, the State petitioned to terminate parental rights for both Jacob and Jessica in August 2020. At the termination hearing, Jessica testified to her progress. First, she had successfully discharged from Clearview the week before. She reported maintaining her sobriety for ninety-one days, her longest stretch since the case opened. Her first outpatient appointment was scheduled for the next week. She also planned to continue with therapy. Second, she had made inquiries about two jobs but had not secured one yet. And third, Jessica was working on finding her own apartment. But upon discharge from Clearview, she went to live with Jamie again. Jessica was aware of DHS concerns about their relationship. But she chose to return to Jamie's place "[b]ecause he said he was going to get sober while [she] was in treatment." She admitted Jamie had been a daily intravenous methamphetamine user and had received no treatment in the last two years. She testified her children could be in Jamie's house "as long as he was sober." She asked the juvenile court for an "additional thirty days" to set up her living situation.

The DHS social worker testified to the depth of Jessica's addiction. She believed Jessica had used methamphetamine daily throughout the CINA case. Most of Jessica's random drug tests were positive for methamphetamine. And she was charged with possession of methamphetamine and non-prescribed narcotics while being booked into jail for other charges. A report from her inpatient treatment said Jessica admitted using methamphetamine "more than three times daily, IV injection."

The social worker also testified about the children. P.L. and B.L., fourteen- and ten-year-old boys, understand that their parents struggle with addictions. They

want to remain with their grandparents. They both feel safe and nurtured in the grandparents' home. Indeed, both boys are physically healthy and meeting developmental milestones. B.L. often expresses frustration and anxiety about his parents making failed promises to bring them home. The girls, two-year-old J.L. and three-year-old K.L., are also in good health and developmentally normal. According to the social worker, they appear comfortable and happy with the grandparents. The grandmother testified the children are doing well. If the parents' rights were terminated, the grandparents intended to adopt all four children.

The juvenile court considered the opinion of Jerod Applegate, an Indian Child Welfare specialist for the Osage Nation Social Services. Based on his testimony, the court found "a vigorous and concerted level of casework beyond what typically constitutes reasonable efforts." Yet those active efforts to reunite Jessica with her children did not succeed. The court noted: "With over two years of involvement, Applegate has witnessed the substance abuse cycle of the parents. The parents' continued inability to address their addictions is detrimental to the long term permanency of the children, causing them to be unsure of their future." With that in mind, the court terminated the parental rights of both Jessica and Jacob.[4]

Jessica appeals.[5]

---

[4] Jacob is not participating in this appeal.

[5] "We review child-welfare proceedings de novo." *In re A.H.*, 950 N.W.2d 27, 33 (Iowa Ct. App. 2020). "The juvenile court's fact findings do not bind us, but we give them weight, particularly with regard to credibility." *Id.* Our primary concern is the best interests of the children. *Id.*

## II. Analysis

## A. Statutory Grounds for Termination

Jessica first contends the State failed to prove the grounds for terminating her parental rights under Iowa Code section 232.116(1) (2020). "There must be clear and convincing evidence of the grounds for termination of parental rights." *In re Z.P.*, 948 N.W.2d 518, 523 (Iowa 2020) (citation omitted). The juvenile court found sufficient evidence to terminate Jessica's rights for all the children under section 232.116(1), paragraph (*l*),[6] for the three older children (P.L, B.L., and K.L.) under paragraph (f),[7] and for the youngest child, J.L., under paragraph (h).[8] We

---

[6] Iowa Code section 232.116(1), paragraph (*l*) requires proof of the following:
> (1) The child has been adjudicated a child in need of assistance pursuant to section 232.96 and custody has been transferred from the child's parents for placement pursuant to section 232.102.
> (2) The parent has a severe substance-related disorder and presents a danger to self or others as evidenced by prior acts.
> (3) There is clear and convincing evidence that the parent's prognosis indicates that the child will not be able to be returned to the custody of the parent within a reasonable period of time considering the child's age and need for a permanent home.

[7] Iowa Code section 232.116(1), paragraph (f) requires proof of the following:
> (1) The child is four years of age or older.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

[8] Iowa Code section 232.116(1), paragraph (h) requires proof of the following:
> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months,

may affirm if clear and convincing evidence supports any of the alternatives. *In re J.A.D.-F.*, 776 N.W.2d 879, 884 (Iowa Ct. App. 2009). A common element among the three paragraphs is proof that the child cannot be returned to the parent. Under paragraphs (f) and (h), the State need only prove that the child cannot be returned "at the present time." Iowa Code § 232.116(1)(f)(4), (h)(4); *see In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (defining "at the present time" as the time of the termination hearing).

Jessica believes she could have resumed care of the children at the time of the hearing. She argues she completed inpatient substance-abuse treatment and "was maintaining a substance free lifestyle." She claims to have engaged in mental-health treatment and "addressed and continue[s] to participate in services, to alleviate any concerns that the [DHS] had throughout the case." She asserts the State "minimized" her progress and failed to carry its burden.

Starting there, we commend Jessica for her progress. But we disagree that the State mischaracterized it. Her substance-abuse progress was recent vintage—she completed the inpatient program just days before the termination hearing. And it was her third effort. Her first attempt was also successful, but she soon lapsed into old patterns. The second inpatient stay ended after only a few days, a month before the successful third try. It is also admirable that she had maintained over ninety days of sobriety. But for most of the CINA case, Jessica

---

or for the last six consecutive months and any trial period at home has been less than thirty days.

    (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

did not engage in treatment and failed to maintain sobriety. In fact, the record showed that she used methamphetamine daily, sometimes more than once a day.

To be fair, her counselors believed that she was taking this attempt at treatment more seriously. But the professionals recognized Jessica's pattern of failing to follow recommendations for ongoing care. And circumstances after she completed treatment were not promising. She had no job and no independent housing. Instead, she returned to living with Jamie, a known methamphetamine user. Jessica's testimony that her children could join her at his home reveals a lack of insight into risky situations. Even so, Jessica recognized she was unready to resume care at the termination hearing. As child-welfare specialist Applegate testified, "[W]e haven't really achieved the level of sobriety and life change that is going to sustain and keep the children safe and send them home." We agree with this characterization.

We cannot return children to their parent's custody "if by doing so [they] would be exposed to any harm amounting to a new child in need of assistance adjudication." *In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992). Jessica's unresolved addiction risks that exposure. Her recent progress is not stable enough to conclude the children would no longer be in need of assistance. *See In re J.S.*, 846 N.W.2d 36, 42 (Iowa 2014) ("[A] juvenile court could reasonably determine that a parent's active addiction to methamphetamine is 'imminently likely' to result in harmful effects to the physical, mental, or social wellbeing of the children in the parent's care." (citation omitted)). Clear and convincing evidence supports the conclusion that Jessica could not resume custody of the children at the time of the termination hearing.

## B. Additional Time

Next, Jessica asserts she made "significant strides" in the months before the termination hearing. So the juvenile court should have given her additional time "to build on her progress." The court may delay permanency for six months under Iowa Code section 232.104(2)(b), if the need for removal would no longer exist after that time. Iowa Code § 232.117(5); *In re A.A.G.*, 708 N.W.2d 85, 89 (Iowa Ct. App. 2005). The best predictor of Jessica's future performance is her past performance. *See In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012). And her past performance is troubling. Jessica's history of instability weighs against granting an extension, and we are unable to enumerate factors, conditions or behavioral changes that will alleviate the need for removal after six months. We decline the mother's request for an extension.

## C. Best Interests

Finally, Jessica contends it was not in the children's best interests to terminate her parental rights.[9] She argues, "Permanently extinguishing the relationship a mother has with her children after significant progress has been made based on lingering concerns was not in the children's long-term best interests." To call her progress "significant" may be premature. To cast the concerns as "lingering" minimizes her substance-abuse history.

The record reveals ongoing, serious doubts about Jessica's ability to maintain her sobriety—from her choice of paramour to her living situation and poor

---

[9] Jessica's petition on appeal cites Iowa Code section 232.116(1)–(3) but presents argument only on the children's "best interests." Subsection (2) deals with "best interests," so we use that statutory language to guide this analysis.

insights. When we consider the children's best interests, we give primary consideration to their safety; the best placement for furthering their long-term nurturing and growth; as well as their physical, mental, and emotional condition and needs. Iowa Code § 232.116(2); *see In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010). Safety and the need for a permanent home mark the "defining elements" of their best interests. *In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially). Jessica has been unable for almost two years to demonstrate a durable commitment to sobriety. She has not shown she can provide a safe and stable space for the children to grow. So the children's best interests compel terminating her rights and allowing the grandparents to adopt them.

**AFFIRMED.**