# IN THE COURT OF APPEALS OF IOWA

No. 22-0650
Filed July 20, 2022

**IN THE INTEREST OF L.H., L.H., and D.W.,**
**Minor Children,**

**L.H., Minor Child,**
        Appellant,

**R.M., Mother,**
        Appellant.

_____

        Appeal from the Iowa District Court for Black Hawk County, Daniel L. Block,

Associate Juvenile Judge.


        A mother and her teenage daughter appeal an order terminating parental

rights. **AFFIRMED ON BOTH APPEALS**.


        Tammy Banning of Waterloo Juvenile Public Defender, Waterloo, attorney

for appellant minor child L.H.

        Jamie L. Schroeder of The Sayer Law Group, P.C., Waterloo, for appellant

mother.

        Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant

Attorney General, for appellee State.

        Joseph Martin, Cedar Falls, guardian ad litem for minor children.


        Considered by Vaitheswaran, P.J., and Tabor and Badding, JJ.

**TABOR, Judge.**

This appeal involves three sisters: fourteen-year-old Le.H., nine-year-old La.H., and five-year-old D.W. Two years ago, they were removed from their mother's care because she lived with an abusive boyfriend and used methamphetamine. Because the mother continued to struggle with violent relationships and substance abuse, the juvenile court eventually terminated her parental rights.[1] The mother and the oldest daughter, Le.H., separately appeal. The mother contests the grounds for termination, argues it was not in the children's best interests, and invokes several statutory exceptions. She also lobbies for placing the children in a guardianship. The daughter raises similar objections, and adds that the juvenile court failed to consider her "self-protective" capacity.

Given the risk posed by the mother's substance abuse and her history of exposing the children to domestic violence, we reject the challenges in both appeals. Like the juvenile court, we do not see a guardianship as a viable permanency option for these children. And while we respect Le.H.'s desire to be reunited with her mother, the risk of returning home—given the looming threat of violence and drug abuse—would be too high even for a self-sufficient teenager.

## I.    Facts and Prior Proceedings

The mother's involvement with the Iowa Department of Human Services (DHS) reaches back to 2015, when a child protective assessment found that she failed to properly supervise her two oldest children because she was using methamphetamine. The family engaged in services into early 2016.

---

[1] The court also terminated the parental rights of the father to Le.H. and La.H. and the father to D.W. Neither father is a party to this appeal.

Four years later, the mother's methamphetamine use brought the DHS back into their lives. In March 2020, the mother entered treatment while the children were cared for by a relative. She admitted using methamphetamine with her paramour, Dustin. The DHS also learned that Dustin had recently assaulted the mother, breaking bones in her face.[2] Despite a no-contact order, Dustin continued to spend time in the family's home. That summer, the juvenile court approved the DHS request to remove the children from their home and adjudicated them as children in need of assistance (CINA).

That fall, the mother sought to have the no-contact order dismissed so that she and Dustin could participate in couple's counseling. Yet they did not engage in consistent counseling. The mother did undergo a substance-abuse evaluation. But her attendance at treatment was spotty. And she was unreliable for drug testing, missing thirty-one of forty appointments.

The abuse also continued. In May 2021, Dustin again assaulted the mother, punching her while he was driving his truck. The mother later reported the violence to her case worker but did not call police.

Because the mother made little progress in addressing the cycle of domestic violence or in drug testing, her visits with the children remained fully supervised. The children were in two different placements. At first, the older girls lived with a relative in the same community as their mother. When that did not work out, they moved to an aunt's home almost two hours away. Both girls, but

---

[2] Suffering violence from intimate partners was not new to the mother. She had been the victim of assault during two previous relationships, including abuse by the father of her two oldest daughters.

especially Le.H., struggled to adapt to the new home and school. The aunt reported to the court that the mother "spent a whole lot of time" during the visitations "trying to make [the aunt] look bad and telling lies." Meanwhile, D.W. stayed in a foster home with a half-sibling on her biological father's side. The Court Appointed Special Advocate (CASA) reported that the two placements tried to get all three sisters together when their schedules allowed it.

In June 2021, the State petitioned for termination of parental rights. The juvenile court held a hearing in September 2021. At that hearing, the court heard from both Le.H. and La.H. that they did not want their mother's rights terminated. The record also showed that the mother was employed, participated in mental-health and substance-abuse programming, and "faithfully" attended interactions with her daughters. At the close of the hearing, the court ruled that it was in the children's best interests to defer permanency under Iowa Code section 232.104(2)(b). In a written order, the court directed the mother to seek domestic violence counseling, deny contact between Dustin and her daughters, and demonstrate her ability to maintain safe and stable housing for the children to return. The order also stated: "No incidents of domestic violence shall occur."

But the court's expectations were not met. At the end of October 2021, the mother went to a casino with Dustin. After returning home, they argued, and he hit her, knocking her to the ground. The mother captured the assault on video. Dustin faced charges for domestic abuse assault, second offense. When the DHS case worker met with Le.H. ten days later, she said that her mother had already shown her the recording, a decision that concerned the worker "due to the intensity of the video footage." On top of the ongoing trauma of domestic violence, the

mother admitted using methamphetamine twice in November 2021 and tested positive in early January 2022.

That same month, the court held another hearing on the State's termination petition. In its April 2022 ruling, the court expressed disappointment with the mother's conduct: "[she] has been deceitful and manipulative to the court and her children throughout the juvenile court's involvement. [She] has taken no responsibility for her actions which led to the children's removal or her failure to make the changes necessary for the children to be safely returned to her care." The court terminated the mother's parental rights under Iowa Code section 232.116(1), paragraphs (e) and (f) (2021). The court emphasized that it had "given great weight to the requests" of the older girls to return to their mother's care. But it denied those requests, citing the mother's "history of chronic substance abuse, instability and domestic violence by [her partners]." The court was convinced that continuing to allow the mother "any legal entitlements to the children would only deny the children the permanency they deserve and perpetuate their childhood of trauma." The mother and her oldest daughter appeal.

## II.     Scope and Standard of Review

We review termination decisions de novo. *In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021). "We are not bound by the factual findings of the juvenile court, though we give them respectful consideration, particularly with respect to credibility determinations." *Id.* The State must back its petition with clear and convincing evidence. *Id.* That level of proof means we harbor no "serious or substantial doubts" about the correctness of the legal conclusions drawn from the evidence. *Id.*

### III.    Analysis

We analyze orders to terminate parental rights in three steps.  *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022).  First, we consider whether the State proved statutory grounds for termination.  Iowa Code § 232.116(1).  Second, we decide whether termination is in the best interests of the children.  *Id.* § 232.116(2).  Third, we consider whether the parent (or in this case the child) has shown that any permissive exceptions apply.  *Id.* § 232.116(3); *see In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018) (explaining "once the State has proven a ground for termination, the parent resisting termination bears the burden to establish an exception to termination").  When raised, we also consider whether a guardianship would have been a better permanency option than termination.

### A.  Statutory Grounds

The juvenile court terminated the mother's parental rights under paragraphs (e) and (f) of section 232.116(1).  We may affirm on either ground if supported by the record.  *W.M.*, 957 N.W.2d at 313.  We focus on paragraph (f), which requires proof of these elements:

> (1) The child is four years of age or older.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

Iowa Code § 232.116(1)(f).

The mother contests the fourth element, contending the children could have been returned to her care by the time of the second termination hearing. She insists that she "consistently addressed her substance abuse and quickly regained sobriety after two lapses in November 2021." As for domestic violence, she asserts that she has connected with an advocate, "escaped the relationship" with Dustin, and has "a plan in place to keep both her and the children safe." The child's petition on appeal describes the mother's progress as "not perfect," but "substantial."

While the mother made some effort to address the concerns that led to the children's removal nearly two years earlier, she did not achieve the stability necessary to ensure a safe return. Even after the juvenile court gave her a second chance at bringing the girls home, she continued her volatile relationship with Dustin. She also continued to use methamphetamine. Her lack of progress on those entrenched issues meant the children could not be returned home without the risk of further harm.[3] *In re T.S.*, 868 N.W.2d 425, 435 (Iowa Ct. App. 2015)

---

[3] Our case law offers two formulations for what it means that children "cannot be returned" to parental custody as provided in section 232.102 (discussing transfer of a child's legal custody if staying in the home would be "contrary to the welfare of the child"). Many cases cite *In re M.M.*, 483 N.W.2d 812, 815 (Iowa 1992) which quotes section 232.102(4)(a)(2)—then numbered section 232.102(5)(b)—for the proposition that custody should be transferred only if the court finds "the child cannot be protected from some harm which would justify adjudication of the child as a child in need of assistance and an adequate placement is available." *See, e.g.*, *In re M.S.*, 889 N.W.2d 675, 680 (Iowa Ct. App. 2016). But more recent cases observe that our supreme court often describes that element simply as the inability to "safely return" children to their parents' care. *See, e.g.*, *In re T.W.*, No. 20-145, 2020 WL 1881115, at *2–3 (Iowa Ct. App. Apr. 15, 2020) (collecting cases). Under either articulation, we find the State met its burden of proof.

(citing mother's methamphetamine abuse and violent relationship as reasons that returning child to her care would be contrary to his welfare).

One more point on safety concerns. The child's counsel argues that because Le.H. is fourteen, the juvenile court should have given more weight to her ability to self-protect if returned to her mother's custody. In a letter to the court, Le.H. acknowledged living in a house where "people were using and fighting," but noted that she had "seen improvements." She wrote, "No abuse has happened in the household around us besides one time and [D.W.] was the only one there." Le.H. also minimized the impact of her mother's drug abuse, saying that even when "using" the mother went to work and helped the girls get ready for school and daycare. Le.H. told the court "I know she might not have done everything you asked but I can tell you she has been trying hard."

We give strong consideration to Le.H.'s views. And we wish we could share the child's optimism about the mother's chances of succeeding as a parent. But the mother's track record is not reassuring. As the DHS case manager testified, Le.H. "has lowered her expectations of what it means to be safe in her mother's care to as long as [the paramour] is hitting just [the mother] and not the children, they are safe." True, older children may have more capacity to repel danger. But not even a teenager should "be called to serve as her own guardian" against an adult abuser or a parent using methamphetamine "under her own roof." *See In re D.D.*, 955 N.W.2d 186, 194 (Iowa 2021). The juvenile court also found the mother has unfairly manipulated the children into a false hope of returning to her care. She told the children they were coming home when that was not imminently likely. And she has threatened to "kill herself" if they are taken away from her. The

juvenile court found, "The children continue to rely upon their mother's false statement to their detriment," and she "will continue to undermine the children's placement and stability." Like the juvenile court, we believe the mother's actions continued to place the girls at serious risk of further harm and termination was proper under paragraph (f).

## B. Best Interests

Once we find a proven ground for termination, we next ask whether severing the legal relationship with the parent would be in the children's best interests. *In re A.B.*, 957 N.W.2d 280, 300 (Iowa 2021). In doing so, we give primary consideration to the children's safety; to the best placement for furthering their long-term nurturing and growth; and to their physical, mental, and emotional condition and needs. Iowa Code § 232.116(2). We also consider whether the children are integrated into a family foster home, the length of time they have been in that placement, and the desirability of maintaining that environment. *Id.* § 232.116(2)(b)(1). And relevant here, we factor in the children's "reasonable preference" if they have capacity to express those opinions. *Id.* § 232.116(2)(b)(2).

The mother contends termination was not in the children's best interests. She focuses on the trouble that La.H. and Le.H. have had in adjusting to their aunt's home. The mother asserts they "had not acclimated to their placement and certainly had not integrated to be part of that family." Le.H. reiterates her strong desire to return to her mother's custody. She is also unhappy that her sister D.W. is in a different placement.

The juvenile court recognized the "difficult transition for both girls based upon living in a new community, missing their family and friends." But that was not

the end of the story. As the court noted, the evidence reflected that both girls continued to "stabilize" in their aunt's home and were participating in "age-appropriate activities." As for D.W., she was thriving in the security and familiarity of her foster home.

From our de novo review, we find the children's safety and their prospects for a healthy future are best served by going forward with termination. The record shows that D.W. has been traumatized by the exposure to domestic violence, leading to a diagnosis of PTSD and a fear of men, even male doctors. While La.H. and Le.H. may have less obvious emotional scars from the turmoil in their mother's home, their welfare likewise depends on a more wholesome environment as they mature and develop social bonds. True, it is usually in their best interest for siblings to live together. *See W.M.*, 957 N.W.2d at 314. But the caregivers have been diligent in bringing all three sisters together for holidays and other events. D.W. is also placed in a foster home with half-siblings on her father's side. Bottom line, we cannot deprive these children of a stable home on the hope that the mother will someday succeed in her struggle against methamphetamine and will stop choosing violent partners. *See W.M.*, 957 N.W.2d at 314.

## C. Exceptions to Termination

Even when termination is in the children's best interests, an exception under section 232.116(3) may preclude termination.[4] The burden is on the objecting

---

[4] That statute provides:

> The court need not terminate the relationship between the parent and child if the court finds any of the following:
>> a. A relative has legal custody of the child.
>> b. The child is over ten years of age and objects to the termination.

parties to show one of those exceptions carries the day. Both the mother and Le.H. rely on (a) placement with a relative, (b) Le.H.'s objection to termination, and (c) the closeness of the parent-child relationship.

Like the juvenile court, we find none of those exceptions should override the decision to terminate the mother's parental rights. First, the aunt did not have "legal custody" of La.H. and Le.H. Thus, section 232.116(3)(a) does not come into play. *In re A.B.*, 956 N.W.2d 162, 170 (Iowa 2021). Second, while Le.H.'s objection is undoubtedly heartfelt, honoring her wishes would undermine her primary needs—for safety and permanency. *See In re A.R.*, 932 N.W.2d 588, 592 (Iowa Ct. App. 2019). Third, the record indeed reflects a strong bond between the mother and her daughters. That said, we must decide whether the children will be disadvantaged by the termination, and whether that disadvantage overcomes the mother's inability to provide for their needs because of her substance abuse and unhealthy relationships. *See In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010). We do not find clear and convincing evidence of an ongoing detriment to the children. Like the juvenile court, we find the mother's ongoing instability is more harmful to the children than the disappointment of the termination.

---

c. There is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship.

d. It is necessary to place the child in a hospital, facility, or institution for care and treatment and the continuation of the parent-child relationship is not preventing a permanent family placement for the child.

e. The absence of a parent is due to the parent's admission or commitment to any institution, hospital, or health facility or due to active service in the state or federal armed forces.

Iowa Code § 232.116(3).

**D.  Guardianship**

Finally, we consider the alternative request from both the mother and Le.H. for a guardianship instead of termination.  Creating a guardianship is not a "legally preferable alternative" to terminating parental rights.  *See In re W.M.*, 957 N.W.2d at 315.  A guardianship may be appropriate if the parent has a close and conflict-free relationship with the caregiver.  *See In re B.T.*, 894 N.W.2d 29, 34 (Iowa Ct. App. 2017).  But that was not the case here.  As the juvenile court noted, the mother worked to undermine the children's placements and stability.  She repeatedly gave them the false hope that they would be returning to her care.  Guardianship was not a better option than termination on these facts.

**AFFIRMED ON BOTH APPEALS.**